ECT INTERNATIONAL, INC., a Wisconsin corporation,
Plaintiff-Appellant,

v.

John ZWERLEIN, Defendant-Respondent.

Court of Appeals

*No. 98–2041. Submitted on briefs April 26, 1999.—Decided May 19, 1999.*

(Also reported in 597 N.W.2d 479.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *John A. Busch* and *Katherine W. Schill* of *Michael Best & Friedrich LLP* of Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Victor E. Plantinga* of *Blumenfeld, Rose & De Jong, S.C.* of Brookfield.

Before Snyder, P.J., Nettesheim and Anderson, JJ.

ANDERSON, J. ECT International, Inc. (ECTI) challenges the circuit court's grant of summary judgment to its former product manager, John Zwerlein. ECTI contends that Zwerlein misappropriated trade secrets, including knowledge of the workings of "promis.e" software and its customer and prospects lists. We affirm. We hold that a party asserting a protectible trade secret must describe it with sufficient particularity to identify the specific trade secret at risk and ECTI failed to do so. We also hold that in imposing a one-year period, after termination of employment, during which an employee could not divulge trade secrets, ECTI manifested an intent that after the expiration of that period a former employee is under no restrictions. Zwerlein's demonstration of a program that could translate or convert files came more than thirteen months after he left ECTI.

ECTI is the exclusive North American distributor for "promis.e" software used in the design and documentation of electrical control systems. "[P]romis.e" is marketed as software that allows the user to generate control system schematics, panel layouts, bills of material, wire lists, terminal plans, etc. At the same time, the software completes other necessary tasks, including ID assignment, cross-referencing, wire numbering and list generation. ECTI also offers complete technical training and support for "promis.e," including the development of specialized or custom program applica-

tions, internal "promis.e" modifications and/or the development of external "add-on" modules.

As the sole North American distributor, ECTI has a proprietary interest in "promis.e." In order to use a fully functioning copy of the software, a user must have an "ADS key" supplied by ECTI. The "ADS key" is a piece of hardware, no bigger than a coaster, that is attached to a computer's parallel port. Without the "ADS key" the "promis.e" software can only be used in a limited demonstration mode.

Zwerlein started working for ECTI as an application specialist in October 1990. He was promoted to product manager in 1994 and was responsible for training the users, answering technical questions, and customizing and enhancing the software. On June 23, 1996, Zwerlein left ECTI and went to work as the "promis.e" administrator for Quad Tech, a customer of ECTI. In August 1997, Zwerlein left Quad Tech and founded a consulting firm called Synergy Solutions, Inc.

As a consultant, Zwerlein would investigate a customer's needs and present the best software to fulfill those needs. For some customers, "promis.e" was the solution; for other customers, a rival product, Toolbox WD, was the solution. Zwerlein had an arrangement with the developer of Toolbox WD to receive a commission on all sales of the software. Toolbox WD used a different process but reached the same result as "promis.e," the design of electrical control systems. The two programs were incompatible—a file created in "promis.e" could not be opened in Toolbox WD.

In the summer of 1997, Zwerlein invited James Baker to see Zwerlein's home office. Baker, at one time a product manager at ECTI and familiar with "promis.e," was then a manager at Rockwell Software,

346

assisting with the management of electrical control system design software called RSWire Designer. Prior to Baker's visit to his home, Zwerlein had solicited Rockwell's business. During Baker's visit, Zwerlein demonstrated "promis.e" and Toolbox WD by performing the equivalent function in both programs. Baker observed the "ADS key" attached to the parallel port of Zwerlein's home computer. During the demonstration, Zwerlein converted an existing "promis.e" file to a Toolbox WD file. He told Baker that all of the "promis.e" schematics and intelligence could be imported into Toolbox WD and converted. Because Baker had never seen anyone convert a "promis.e" file to another format, he reported the demonstration to Art Sawall, President of ECTI.

ECTI filed this action against Zwerlein seeking unspecified damages for his misappropriation of trade secrets. ECTI alleged that the software file system for "promis.e" and its customer and prospects lists are trade secrets. ECTI alleged that Zwerlein developed or assisted in the development of a program that can translate "promis.e" files into Toolbox WD files. Further, it was alleged that Zwerlein was making sales calls on companies appearing on ECTI's prospects list. Zwerlein filed a general denial and, after limited discovery, moved for summary judgment. The circuit court granted Zwerlein's motion, ruling that any translator or conversion program was created by Zwerlein from his own intelligence, knowledge and experience and not from the misappropriation of a trade secret. As to the customer and prospects lists, the circuit court noted that there was no evidence that either list had any value eighteen months after Zwerlein left ECTI and that there was no evidence that Zwerlein was using either list. Finally, the court concluded that

there was a lack of evidence that Zwerlein had an "ADS key" in his possession. ECTI appeals.

We review a motion for summary judgment using the same methodology as the trial court. *See M & I First Nat'l Bank v. Episcopal Homes Management, Inc.*, 195 Wis. 2d 485, 496, 536 N.W.2d 175, 182 (Ct. App. 1995). That methodology is well known, and we will not repeat it here except to observe that we may affirm a circuit court's decision for reasons other than those either presented to, or relied upon by, the circuit court. *See Liberty Trucking Co. v. DILHR*, 57 Wis. 2d 331, 342, 204 N.W.2d 457, 463–64 (1973). This is especially true on summary judgment where the requisite methodology requires de novo review. *See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987).

We begin our analysis by deciding whether ECTI has established the existence of a protectible trade secret. The definition of "trade secret" is found in § 134.90(1)(c), STATS.,[1] which states:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:
>
> 1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> 2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

---

[1] Section 134.90, STATS., Wisconsin's version of the Uniform Trade Secrets Act, was enacted by 1985 Wis. Act 236.

From the statute, we derive three attributes of a protectible trade secret. To qualify as a protectible trade secret, the "promis.e" software, customer list and prospects list: (1) must be information such as a formula, pattern, compilation, program, device, method, technique or process; (2) that has independent economic value, available from only one source; and (3) is the subject of reasonable efforts to maintain its secrecy. *See Leske v. Leske*, 197 Wis. 2d 92, 98, 539 N.W.2d 719, 721–22 (Ct. App. 1995).

The first attribute requires that the item or material ECTI asserts qualifies as a protectible trade secret must be "information" in a substantive form that is generally not known to others in the particular trade. In its complaint and submissions in opposition to the motion for summary judgment, ECTI alleges that "[t]he software file system for 'promis.e' is a trade secret in that it is a program which derives independent economic value from not being generally known or ascertainable by proper means and is the subject of efforts by ECTI to maintain its secrecy." ECTI also alleges that "customer lists and lead lists are also trade secrets in that each derives independent economic value from not being generally known or ascertainable by proper means and each is the subject of efforts by E CTI to maintain each's secrecy."

These allegations echo § 134.90, STATS., and are nothing more than legal conclusions. The allegations fail to allege the ultimate facts showing the existence of a trade secret. *See Diodes, Inc. v. H.D. Franzen*, 67 Cal. Rptr. 19, 23 (Cal. Ct. App. 1968). *Diodes* is a good example of what is required from one who seeks to protect trade secrets. In *Diodes,* an employer was attempting to prevent former employees from using a "secret pro-

cess" they developed while employed with Diodes. In affirming a dismissal for failure to state a claim, the California Court of Appeals excused the party asserting a trade secret from having to "spell out the details of the trade secret" because it would destroy what was trying to be protected. *See id.* at 24. However, the *Diodes* court did require

> the complainant [to] describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant [and the court] to ascertain at least the boundaries within which the secret lies.

*Id.*

Because ECTI's complaint repeats statutory language we cannot separate what is a trade secret from what is general knowledge in this niche of the CAD (computer aided design) software industry or what is the special knowledge of CAD software programmers and product managers like Zwerlein. Further, none of ECTI's submissions in opposition to the summary judgment motion go beyond the generalizations found in its complaint.

The requirement that the party asserting a trade secret include with some specificity the nature of the trade secret has been extended to require the party to present evidence of the nature of the trade secret. In *AMP, Inc. v. Fleischhacker*, 823 F.2d 1199 (7th Cir. 1987), the Seventh Circuit applied Illinois' version of the Uniform Trade Secrets Act. AMP brought an action to prevent a former division manager from revealing trade secrets in his new job as director of marketing for

350

one of AMP's competitors. The district court granted judgment to the defendant, AMP's competitor, and AMP appealed. In affirming the judgment, the Seventh Circuit noted AMP's consistent failure during every stage of the proceedings to identify any particularized trade secrets actually at risk. *See id.* at 1203. The court rebuked AMP for failing to specify precisely what trade secrets it believed to be at risk by identifying what information the former employee had misappropriated. *See id.* The federal court reviewed decisions from the Illinois Supreme Court and concluded that Illinois courts do not extend protection under the law of trade secrets to generalized allegations of trade secrets. *See id.*

Other courts that have decided whether a trade secret has been described with sufficient specificity have all required more than a generalized allegation that there was a protectible secret. *See Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 661 (4th Cir. 1993) (it was not necessary to disclose all of the details of the trade secrets, but plaintiff had to do more than merely allege that it had a secret); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993) (because the trade secrets had not been specifically identified, the court could not determine if any trade secrets were misappropriated); *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170, 1177 (C.D. Cal. 1989), *aff'd,* 914 F.2d 1256 (9th Cir. 1990) (citing *Diodes* with approval).

A computer program generally "includes source code, which is the developer's tool in creating software, object code, and other technical information, including program architecture, design definitions or specifications, flow diagrams and flow charts, data structures, data compilations, formulae and algorithms embodied

and used in the software." Robert C. Scheinfeld & Gary M. Butter, *Using Trade Secret Law to Protect Computer Software*, 17 RUTGERS COMPUTER & TECH. L.J., 381, 383 (1991) (footnotes omitted). ECTI's allegation that the "software file system for 'promis.e' is a trade secret" does not describe which of the components of "promis.e" were misappropriated by Zwerlein.

The second attribute—an independent economic value available from only one source—is present in the "promis.e" software. "Without question, computer software can be protected under trade secret law. Indeed, each software-oriented company may have a body of information that is not generally known to its competitors and which gives it a competitive advantage in the marketplace." Scheinfeld & Butter, *supra* at 382–83 (footnotes omitted). In the area of CAD of electrical control systems, "promis.e" competes with Toolbox WD and RSWire Designer, to list just two.[2] In an affidavit filed in opposition to Zwerlein's motion for summary judgment, the president of ECTI explained · that the inability to convert "promis.e" files to other formats protected the commercial value of the program. The president went on to explain, "[T]he commercial advantage of this is obvious because once a user commits to [our software], it is not easy to switch to a competitor's software because [our software's] files

---

[2] In *Baystate Technologies, Inc. v. Bentley Systems, Inc.*, 946 F. Supp. 1079, 1082 (D. Mass. 1996), the use of data translators or converters is explained:

> In general, data translators are common in the CAD [computer aided design] market because users of CAD products commonly employ more than one CAD system to perform their necessary tasks and, as a result, often transfer information between various CAD systems. This need has created a demand for translators of all kinds in the CAD market . . . .

cannot be converted." We are persuaded that "promis.e" does have independent economic value available from only one source. Other jurisdictions have reached the same conclusion. *See Stargate Software Int'l, Inc. v. Rumph*, 482 S.E.2d 498, 502 (Ga. Ct. App. 1997) (the term "trade secret" applies to data or a program); *Jostens, Inc. v. National Computer Sys., Inc.*, 318 N.W.2d 691, 698 (Minn. 1982) ("unique principles, engineering, logic and coherence in computer software may be accorded trade secret status"); *Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) (the unique arrangement of a combination of "off-the-shelf " components can afford a competitive advantage to the plaintiff.[3])

The second attribute is also present in the customer and prospects lists. Because Wisconsin adopted the Uniform Trade Secrets Act as § 134.90, STATS., in 1986, a customer list can be afforded protection. *See Minuteman, Inc. v. Alexander*, 147 Wis. 2d 842, 851 857, 434 N.W.2d 773, 777, 779 (1989). Protection is afforded lists in those sectors of the economy where identical or nearly identical products are sold to a small group of purchasers. The lists are given trade secret status because in a buyer's market the limited number of sellers are scrambling after the same dollar. *See id.* at 857, 434 N.W.2d at 779.

The third attribute—ECTI took reasonable efforts to maintain its secrecy—is not present in any of the three items. ECTI had all employees, including

---

[3] "[A] competitive benefit that the trade secret owner enjoys must derive from it not being generally known or readily ascertainable through proper means by competitors." Ari B. Good, *Trade Secrets and the New Realities of the Internet Age*, 2 MARQ. INTELL. PROP. L. REV. 51, 68 (1998).

Zwerlein, sign a Patent and Confidential Information Agreement in which the employee acknowledged

> that certain information in the possession of the COMPANY in the nature of, but not limited to, customer lists, price lists, new products in the course of development, blueprints, patterns, and information as to suppliers, is considered confidential information by the COMPANY and/or trade secrets of a character which are valuable to the COMPANY, (hereafter Information) and I agree not to make use of, nor divulge, such Information to anyone . . . either during or for a period of one year after the termination of my employment . . . .

Zwerlein signed this agreement in December 1993.

Courts are realists and recognize that it is almost impossible to prevent an employee from discovering an employer's trade secrets; therefore, courts have held that confidentiality agreements are sufficient evidence of reasonable efforts to maintain secrecy if the agreements plainly informed the employees that all of the employer's information is confidential.[4] *See Aries Info. Sys., Inc. v. Pacific Management Sys. Corp.*, 366

---

[4] Compounding the problem of preventing former employees from revealing trade secrets is the right of the employee to use his or her skills, experience and general knowledge. *See Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 175 (2d Cir. 1990). Any overly restrictive provisions prohibiting a former employee from making use of or relying upon his or her independent recollections of generalized technical information learned from a prior employer could severely impede employee mobility and undermine the competitive basis of our free economy. *See AMP, Inc. v. Fleischhacker*, 823 F.2d 1199, 1204–05 (7th Cir. 1987). A computer programmer, like an auto mechanic, must be free to pursue his or her career.

N.W.2d 366, 368–69 (Minn. Ct. App. 1985); *Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.*, 732 F. Supp. 370, 375–76 (S.D.N.Y. 1989), *aff'd*, 920 F.2d 171 (2d Cir. 1990) (if plaintiff possessed a trade secret, the nondisclosure agreements signed by its employees would prevent the secret's disclosure); *Stargate Software Int'l, Inc.*, 482 S.E.2d at 502 ("Requiring employees to sign confidentiality agreements may, in some circumstances, be 'sufficient to constitute a reasonable step to maintain the secrecy of information alleged to have been misappropriated.' "); Scheinfeld & Butter, *supra* at 387–88.

The existence of a confidentiality agreement is not always enough. In this case, the Patent and Confidential Information Agreement ECTI required Zwerlein to sign does not preserve ECTI's intent that "promis.e" and the customer list and prospects list remain secret. The confidentiality agreement contains a time limit; Zwerlein agreed not to divulge any trade secret "during or for a period of *one year after the termination of my employment.*" (Emphasis added.) Zwerlein terminated his employment with ECTI on June 23, 1996; Baker reported that Zwerlein's demonstration of converting files from "promis.e" to Toolbox WD occurred in August of 1997, more than thirteen months after Zwerlein left ECTI. By limiting the period in which an employee agreed not to divulge trade secrets ECTI manifested its intent that after one year there was no need to maintain the secrecy of any sensitive and confidential information Zwerlein learned while employed. *See Baystate Techs., Inc. v. Bentley Sys., Inc.*, 946 F. Supp. 1079, 1092 (D. Mass. 1996).

In conclusion, we affirm the circuit court's granting of summary judgment to Zwerlein. ECTI has failed

to establish the specific trade secrets Zwerlein misappropriated in converting a "promis.e" file to a Toolbox WD file. In addition, ECTI does not have a protectible trade secret in "promis.e" software, its customer list and its prospects list because it has manifested its intent that the confidentiality of trade secrets expires one year after an employee terminates his or her employment.

*By the Court.*—Judgment affirmed.