IDX SYSTEMS CORPORATION,
Plaintiff,

v.

EPIC SYSTEMS CORPORATION,
Mitchell Quade, Michael Rosencrance
and the University of Wisconsin Medi-
cal Foundation, Defendants,

and

Westfield Insurance Company,
Defendant Intervenor

No. 01–C–0039–S.

United States District Court,
W.D. Wisconsin.

July 31, 2001.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

Plaintiff IDX Systems Corporation ("IDX") commenced this diversity action against defendants Epic Systems Corporation ("Epic"), Mitchell Quade ("Quade"), Michael Rosencrance ("Rosencrance") and The University of Wisconsin Medical Foundation ("UWMF") alleging Wisconsin state law causes of action for trade secret misappropriation and tortious interference with prospective advantage. Defendants UWMF and Epic counterclaim for tortious interference with contract and UWMF further counterclaims for declaratory judgment. Defendant intervenor Westfield In-

surance Company ("Westfield") cross claims for a declaration as to its duties toward its insureds, defendants UWMF, Quade and Rosencrance. The action is presently before the Court on motions for summary judgment under Federal Rule of Civil Procedure 56(c). All motions have been briefed and the parties have submitted their proposed findings of fact and conclusions of law ("PFFs").

## UNDISPUTED FACTS

Plaintiff IDX is a Vermont corporation. Defendants Epic and UWMF are Wisconsin corporations. Defendants Quade and Rosencrance are both Wisconsin residents, current employees of UWMF and former employees of Epic.

Plaintiff IDX and defendant Epic are competing vendors of information management software for physicians groups, hospitals and healthcare delivery systems. This software has various applications in organizing patient registration, physician and hospital billing and scheduling, managed care and clinical practice. Plaintiff's product is known as the IDX Practice Management System.

In December 1986 Affiliated University Physicians ("AUP") executed a contract with plaintiff IDX's predecessor-in-interest, Interpretative Data Systems for the provision of information management software ("the 1986 contract"). In June 1989 Physicians' Plus Medical Group ("P–Plus") contracted with IDX to utilize the IDX Practice Management System ("the 1989 contract"). Both contracts contain provisions reserving IDX's proprietary rights and requiring AUP and P–Plus to adhere to certain confidentiality precautions. The then newly-formed UWMF merged with AUP in 1997 and acquired P–Plus in 1998.[1]

---

**1.** Defendant UWMF disputes the extent to which it assumed AUP's liabilities and ac-

quired P–Plus' assets. It omits any argument, however, that the 1986 and 1989 contracts

UWMF continued to use the IDX Practice Management System employed by its predecessors-in-interest.

In May 1998 defendant UWMF sought a vendor to provide it with information management, accounting and billing software. Plaintiff IDX and defendant Epic were two of several vendors competing for the new UWMF contract. Throughout the vendor selection process UWMF continued to use the IDX Practice Management System.

In March 2001 after hearing the recommendations of the various internal task forces conducting the vendor selection process the UWMF Board of Directors voted to approve the purchase of the IDX product and to extend contract negotiations with IDX. Several contract issues remained to be resolved. Plaintiff IDX signed and forwarded a proposed contract in September 2000, but it was never signed by UWMF. Instead, in October 2000 UWMF awarded its contract to defendant Epic. The two parties executed an agreement in December 2000.

In October 2000 IDX's President, Bob Hueber, states that he was called by a person using the pseudonym "Jack Lutkens" who apprised him of questionable practices by UWMF during the vendor selection process. IDX subsequently learned that during the vendor selection process defendants UWMF and Epic had engaged in a long series of "design" meetings whereby technical employees from the parties met and discussed improvements to Epic's product.

In early November 2000, IDX was sent a copy of a memorandum from an anonymous source detailing numerous improprieties during the vendor selection process. Later that month, UWMF employee Cliff Pulver came forward as the anonymous source when he contacted Hueber. Among other things, Pulver told Hueber and IDX attorney David Sellinger that in the design meetings UWMF disclosed detailed information to Epic about the IDX Practice Management System and that a UWMF employee "translated" the IDX product to Epic programmers. Pulver further told IDX that defendants Quade and Rosencrance, who were in charge of the vendor selection process, were biased in favor of their former employer Epic, pressured UWMF employees to favor Epic in the selection process, and directed UWMF employees to assist Epic in improving its software in the design meetings.

Plaintiff filed this suit on January 18, 2001. It alleged causes of action for trade secret misappropriation, tortious interference with contract, tortious interference with prospective advantage, unfair competition, conspiracy and breach of contract. The Court subsequently dismissed plaintiff's claims for tortious interference with contract, unfair competition and conspiracy and limited its claim for tortious interference with prospective advantage pursuant to Federal Rule of Civil Procedure 12(b)(6). Additional facts will be provided as made necessary by the analysis of the parties' claims.

## MEMORANDUM

Summary judgment will be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.Pro. 56(c). Facts are material in a summary judgment analysis if they are outcome influencing under the substantive law governing the action, and any disputes

are not binding upon it. Its arguments on summary judgment assume that they are so binding. Accordingly, the Court will assume

for purposes of this motion that the two contracts bind defendant UWMF.

of material fact are "genuine" if from the evidence a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether such disputes exist the Court resolves ambiguities and reasonable inferences against the moving party. *Id.* at 255, 106 S.Ct. 2505. If and when the movant makes its prima facie showing under Rule 56(c) the burden shifts to the non-movant to show, by affidavit or otherwise, that a genuine issue of material fact remains for the fact finder. Fed.R.Civ. Pro. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### I. Plaintiff's Claim for Trade Secret Misappropriation by Defendants Epic, UWMF, Quade and Rosencrance

Defendants move for summary judgment on plaintiff's trade secret misappropriation claim on the ground that plaintiff IDX has failed to identify its alleged trade secrets with the requisite particularity.[2] Plaintiff contends that its Supplemental Answer to Defendant Epic's Interrogatory No. 1 ("Supplemental Answer"), and the appendices thereto, meet its burden to identify its trade secrets. Exhibits to Pl.'s PFF in Opp'n to Defs.' Mot. for Summ. J., Ex. 10 ("Exs. to Pl.'s PFF").

The Wisconsin Uniform Trade Secrets Act ("WUTSA"), Wis. Stat. § 134.90, defines a trade secret as information, "such as a formula, pattern, compilation, program, device, method, technique or process" that (1) has independent economic value and (2) is the subject of reasonable efforts to maintain secrecy. *ECT Int'l,*

*Inc. v. Zwerlein,* 228 Wis.2d 343, 597 N.W.2d 479, 482 (App.1999). The information cannot be generally known or readily ascertainable. Wis. Stat. § 134.90(1)(c)(1). Implicit in this definition is the requirement that plaintiff particularize the information it seeks to protect. Plaintiff therefore has the burden to specify its trade secrets. *MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 522 (9th Cir.1993) (*cited in ECT Int'l,* 597 N.W.2d at 483).

■ General allegations of the existence trade secrets will not suffice—a reasonable degree of precision and specificity is necessary. The Seventh Circuit Court of Appeals has held that putative trade secret holders must do more than point to broad areas of technology and claim unspecified trade secrets. *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1266 (7th Cir.1992). Trade secrets must be concrete and particularized. *Id.;* *see also AMP Inc. v. Fleischhacker,* 823 F.2d 1199, 1203 (7th Cir.1987) ("AMP has consistently failed throughout this litigation to identify any particularized trade secrets actually at risk."); *Minnesota Mining & Mfg. Co. v. Pribyl,* 259 F.3d 587, 594 n. 2 (7th Cir.2001).[3]

■ This begs the question as to the level of specificity required in identifying trade secrets on summary judgment. At the complaint stage, with its notice pleading requirements under Federal Rule of Civil Procedure 8, plaintiff is not and cannot be expected to plead its trade secrets in detail. Such a public disclosure would amount to an effective surrender of trade secret status. However, once protective

---

**2.** Only defendant UWMF makes this argument in its brief. The remaining defendants join in UWMF's argument.

**3.** Both Wisconsin and Illinois have adopted the Uniform Trade Secrets Act ("ITSA").

*Compare* Wis. Stat. § 134.90 *with* 765 Ill. Comp. Stat. § 1065. In *Composite Marine* and *AMP* the Seventh Circuit construed the ITSA. These interpretations are authoritative. *See* Wis. Stat. § 134.90(7).

orders have been erected to maintain the necessary secrecy plaintiff must come forward with particularized trade secrets. By the summary judgment and trial stages plaintiff must describe its trade secrets in sufficient detail such that a reasonable jury could find that plaintiff established each statutory element of a trade secret. *See Trandes Corp. v. Guy F. Atkinson Co.,* 996 F.2d 655, 661 (4th Cir.1993) (*cited in ECT Int'l,* 597 N.W.2d at 483). In other words, the description must be specific enough to allow the meaningful comparison of the putative trade secret with information that is generally known and ascertainable in the relevant field or industry. *See Universal Analytics v. MacNeal–Schwendler Corp.,* 707 F.Supp. 1170, 1177 (C.D.Cal.1989)(trade secret should be described "with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade.")(*cited in ECT Int'l,* 597 N.W.2d at 483). Were it otherwise plaintiff could not prove its case at trial, defendants would be unable to mount a defense and the Court would be hampered in fashioning appropriate injunctive relief.

Plaintiff contends that it has met its burden to identify the specific trade secrets that it seeks to protect in this action. It relies exclusively on the Supplemental Answer and its appendices. The Supplemental Answer purports to provide nine summary descriptions of plaintiff's trade secrets. Appendix A contains "specific references" to technical documentation. Pl.'s Br. in Resp. to Def. UWMF's Mot. for Summ. J. at 18 ("Pl.'s Resp. Br."). Appendix B is a "forty two page complete description of the trade secrets." Id. Plaintiff submits that these three documents, read together, create a definitive list of nine trade secrets.

## A. Supplemental Interrogatory Answer

█ Plaintiff's Interrogatory Answer sets forth so-called summary trade secret descriptions. It lists as trade secrets the "concepts, designs, methods and processes that, in combination, provide:" (1) batch charge entry and batch payment posting, (2) heads down charge entry, (3) real time checking of charges, (4) heads down payment posting, (5) invoice level processing, (6) account inquiry, (7) end user reminder notices, (8) end user defined comments associable with a tickler system and (9) demand statements and statement messages. Exs. to Pl.'s PFF, Ex. 10 at 2–6.

These nine items are not trade secrets themselves, but rather are areas of trade secrets. Each area is a feature, or functionality, of plaintiff IDX's Practice Management System. The trade secrets are more narrowly said to be the "concepts, designs, methods and processes" underlying each of these nine functionalities. Plaintiff IDX's position is that the means by which the functionalities are provided in its product are trade secrets. Pl.'s PFF at ¶ 33. The functionalities themselves are not trade secrets. *See* Pl.'s Resp. to Def. UWMF's PFF ¶¶ 141, 145, 147, 150, 152, 154, 156, 157, 159, 161, 163, 165, 168, 170, 172, 174, 175, and 178. Nor could they be as plaintiff concedes that the software products of defendant Epic and other competitors incorporate these same nine functionalities. Id. Because the means used to provide the nine functionalities in the IDX product are the asserted trade secrets at issue these means are those which plaintiff must identify with specificity.

Plaintiff's Supplemental Answer is silent as to any specific concepts, designs, methods or processes underlying the functionalities. It designates nine functionalities as *trade secret areas* but fails to identify any trade secrets. The document does not

identify any means devised by IDX to provide the nine functionalities. It succeeds only in describing the functionalities, specific abilities and benefits they provide IDX customers.

By specifying its trade secrets only as "concepts, designs, methods and processes" plaintiff is simply regurgitating the statutory definition of trade secrets under WUTSA. *See* Wis. Stat. § 134.90 (incorporating "methods" and "processes" in the statutory definition). Beyond narrowing the areas of the product in which to look, there is no clue as to the substantive content of trade secret information. It fails to clarify that actual information to be protected or even that number of trade secrets which are at issue. Plaintiff has pointed to nine features of its product, not trade secrets themselves, and asserted that their existence is the result of trade secrets. This is insufficient. The Supplemental Answer, by itself, fails to carry plaintiff's burden of identifying specific trade secrets at risk.

## B. Appendix A—Technical Documentation

■ Plaintiff urges the Court to consider its summary trade secret descriptions in the Supplemental Answer in conjunction with Appendix A. Appendix A purports to be a set of specific references to technical documentation verifying the identity of plaintiff's alleged trade secrets.

Appendix A, however, is merely a list of twenty-one user manuals. Their extensive contents cover far more than the nine trade secret areas identified in the Supplemental Answer, and it cites no pages in reference to any specific trade secrets. Moreover, the list provides no indication as to those trade secrets or trade secret areas documented in any given manual. The only apparent way to search the manuals

is through a cover-to-cover reading of all twenty-one volumes.

Appendix A is of no use in identifying the specific trade secrets at issue. Neither defendants nor this Court are required to sift through stacks of technical manuals and speculate as to what amorphous "concepts, designs, methods and processes" found within that plaintiff may be seeking to protect. Plaintiff's broadbrush documentation stands in sharp contrast to the narrowing and clarifying documentation provided in *Nilssen v. Motorola, Inc.*, 963 F.Supp. 664 (N.D.Ill.1997). There the district court found the plaintiff's relatively generalized identification of a set of trade secret information to be sufficient given the supplemental reference to specific documents contained in an otherwise voluminous record. *Nilssen,* 963 F.Supp. at 673.

Plaintiff's documentation, in contrast, adds nothing. Plaintiff has effectively buried its trade secrets in documentation. After reading plaintiff's Supplemental Answer together with Appendix A the Court faces an unknown number of concepts, designs, methods and processes somewhere documented within twenty-one technical product manuals. This combination can yield no concrete, particularized trade secrets.

## C. Appendix B—Forty-two Page Description of Trade Secrets

■ Plaintiff IDX asserts that Appendix B provides a complete description of the trade secrets it pursues in this litigation. Plaintiff argues that summary judgment can only be granted to defendants under their argument if the Court finds that "absolutely nothing in those forty-two pages is a trade secret." Pl.'s Resp. Br. at 19.

Appendix B is a forty-two page narrative. Like Appendix A, its subject matter

significantly exceeds the nine trade secret areas set forth in the Supplemental Answer, and any discussions pertaining to said areas are scattered and incomplete. Discussion of certain trade secret areas as identified in the Supplemental Answer is wholly absent. The Court finds no explicit discussion of real time charge checking (area No. 3), account inquiry (area No. 6) or end user reminder notices (area No. 7). The appendix does contain discussion of heads down data entry (areas Nos. 2 & 4), batches (area No. 1), the tickler system (area No. 8), invoice level processing (area No. 5) and statements (area No. 9). *See* Exhibits to Pl.'s PFF in Opp'n to Defs.' Mot. for Summ. J., Ex. 10, Appendix B at 11, 13–15, 19, 25, 27 & 34. However, these discussions do not distinguish between descriptions of the functionalities and their benefits and any descriptions of the concepts, designs, methods and processes that provide them. The narrative fails to explicitly identify any concepts, designs, methods or processes as trade secrets. Appendix B provides no new light on the identity of the trade secrets in this action.

The Court cannot begin to speculate on the identity of the trade secrets plaintiff is seeking to protect. IDX has produced an unnavigable amount of documentation and instructed the Court and defendants to find its trade secrets themselves. Plaintiff's position that everything in Appendix B is a trade secret until shown otherwise is no different than the approach, repeatedly rejected by the courts, that plaintiff can point to broad areas of technology and vaguely assert that something within is a trade secret. *Composite Marine,* 962 F.2d at 1266. Long lists of general areas of information containing unidentified trade secrets are not substitutes for particularized and concrete trade secrets. *AMP,* 823 F.2d at 1203.

Plaintiff has failed to produce any evidence so as to identify its secret "concepts, designs, methods and processes". As the Fourth Circuit Court of Appeals held in *Trandes,* without some evidence as to what this information is a jury will be unable to compare it to matters within the general knowledge in the trade. *Trandes,* 996 F.2d at 662. Listing product functionalities as trade secret areas is insufficient, particularly here, where it is conceded that the functionalities are not trade secrets and exist in competing products. Where plaintiff seeks to protect as trade secrets specific means of providing common features those specific means must be identified. The substance of plaintiff's trade secrets is wholly unknown. From plaintiff's vague and amorphous submissions it is impossible to determine whether plaintiff's information satisfies the statutory definition of trade secret. Plaintiff's claim fails for lack of particularized trade secrets and, accordingly, will be dismissed.

## II. Plaintiff's Claim for Breach of Contract against Defendant UWMF

■ Plaintiff IDX claims defendant UWMF breached the 1986 and 1989 contracts by disclosing trade secrets and confidential information to defendant Epic. Pl.'s Amended Compl. ¶¶ 112–113. Paragraph 12 in the 1986 contract and Paragraph 13 in the 1989 contract govern the parties' obligations as to confidentiality, non-disclosure and proprietary rights. In the 1986 contract Paragraph 12(c) precludes the customer from providing or making available to a third party the Practice Management system or any related materials. Related materials are defined in 12(a) as "manuals, documentation, techniques, procedures, ideas, concepts, output and reports." The 1989 contract contains a more explicit confidentiality provision. Paragraph 13.2.2(ii) prohibits the customer

from using or disclosing or divulging any data or information relating to the IDX system. The provisions do not purport to be limited to information rising to the level of trade secret but rather attempt to restrict disclosure of all information relevant to plaintiff's product regardless of temporal or geographic considerations.

This Court has previously held that such confidentiality agreements, which contain no geographic or temporal limitations, can be enforced only to protect proprietary information that rises to the level of trade secret. *See* Memorandum and Order of May 4, 2001 at 2–3; *see also* Memorandum and Order of April 11, 2001 at 5–6. An agreement that acts to shield information from the promisee's competitors acts as a trade restraint under Wisconsin law. *See Tatge v. Chambers & Owen, Inc.*, 219 Wis.2d 99, 579 N.W.2d 217, 222 (1998). Such a restraint is reasonable only where it serves to protect the promisee's legitimate business interests. *Journal Co. v. Bundy*, 254 Wis. 390, 37 N.W.2d 89, 89 (1949).

Plaintiff has legitimate business interests in trade secrets. Confidentiality provisions that protect trade secrets are inherently reasonable and need not include geographic or temporal limitations. *Nalco Chemical Co. v. Hydro Technologies, Inc.*, 984 F.2d 801, 803 (7th Cir.1993). Provisions protecting information not rising to the level of trade secrets, however, are suspect and must incorporate such limitations. *Id.* This is only logical. Confidential information that does not rise to the level of trade secret is by definition either worthless, generally known or readily ascertainable, or not the subject of reasonable secrecy efforts. *See* Wis. Stat. § 134.90(c)(1)-(2). Plaintiff has little, if any, legitimate interest in forbidding disclosure of such information. Paragraphs 12(c) and 13.2.2(ii) of the 1986 and 1989

contracts, respectively, as applied to mere confidential information, are unreasonable restraints of trade and cannot be enforced.

While both paragraphs are enforceable as to the protection of trade secret information plaintiff cannot show a breach of contract because, as discussed in Part I of this Memorandum and Order, it has failed to identify any trade secrets. The possession of trade secrets is a condition precedent to showing a breach of these provisions. Its failure to identify trade secrets forecloses this claim. Plaintiff's breach of contract claim will be dismissed.

### III. Plaintiff's Claim for Tortious Interference with Prospective Advantage against Defendant Epic

In its complaint plaintiff IDX claims that defendant Epic interfered with its prospective economic advantage by inducing UWMF's breach of confidentiality provisions and by making false statements to UWMF about plaintiff. The Court dismissed plaintiff's claim as it related to the induced breach of confidentiality provisions on the grounds that it was displaced by WUTSA. *See* Memorandum and Order of March 23, 2001 at 10–11. Presently, the Court has been apprised that plaintiff IDX is no longer pursuing its tortious interference claim as it relates to Epic's alleged false statements to UWMF. *See* Letter of Attorney Mark Camelli of July 11, 2001 (citing insufficient evidence of false statements by Epic). Accordingly, summary judgment will be granted and the claim will be dismissed.

### IV. Defendant UWMF and Epic's Counterclaims for Tortious Interference with Contract

Defendants UWMF and Epic claim that by pursuing its claims plaintiff IDX has imposed heavy legal costs on defendants. These costs have allegedly hindered defendants' performance under their new contract because of the necessary re-direction

of capital and personnel time. Defendants claim IDX tortiously interfered with their contract by filing this action. Plaintiff moves for summary judgment based on the *Noerr–Pennington* doctrine as well as the claims' substantive merits.

### A. The Noerr–Pennington Doctrine

Plaintiff asserts that defendants' tortious interference counterclaims are barred by the *Noerr–Pennington* doctrine. The *Noerr–Pennington* doctrine provides that "parties may petition the government for official action favorable to their interests without fear of suit even if the result of the petition, if granted, might harm the interest of others." *Tarpley v. Keistler,* 188 F.3d 788, 794 (7th Cir.1999). In its Memorandum and Order of April 11, 2001 the Court held that *Noerr–Pennington* applied to defendants' counterclaims for tortious interference because defendants sought to impose liability for plaintiff's act of filing suit in federal court. *See* Memorandum and Order of April 11, 2001 at 8–12 (*citing Tarpley, supra,* and *Video Int'l Prod., Inc. v. Warner–Amex Cable Communications,* 858 F.2d 1075 (5th Cir. 1988)). The Court left open the question whether the "sham litigation" exception was applicable to deprive plaintiff's action of *Noerr–Pennington's* immunity. Defendants argue in opposition to summary judgment that plaintiff's action is sham litigation and therefore not immunized under *Noerr–Pennington.*

 *Noerr–Pennington's* underlying First Amendment right to petition the government does not immunize a petitioning party who seeks to use the governmental process, as opposed to the results of that process, to harm a party. *Tarpley,* 188 F.3d at 794. Sham litigation is the pursuit

of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 62, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (*"PRE"*).[4] This objective criteria for determining sham litigation has been equated to the common law notion of probable cause. *PRE* at 62–63, 113 S.Ct. 1920. A party has probable cause to institute civil proceedings if it could reasonably believe in the possibility of the claim being held valid. Restatement (2d) of Torts § 674, cmt e (*cited in PRE,* 508 U.S. at 62–63, 113 S.Ct. 1920). Following the rationale of the Restatement, the petitioner must reasonably believe that facts exist in support of its claim. Restatement (2d) of Torts § 675.

Defendants argue that plaintiff IDX's action is completely baseless and was instituted to bully a competitor and former customer in order to gain a market advantage. First, they submit that no reasonable litigant in plaintiff's position would have believed that it had protectable trade secrets. Defendants argue that plaintiff freely disclosed its product in promotional literature, at trade show demonstrations and at on-site customer visits. They cite the large numbers of customer employees and IDX's own former employees who know of IDX's trade secrets. They contend that IDX's product, as used by UWMF, was the result of UWMF's own tailoring and customization and that this tailoring negated IDX trade secrets. They maintain that plaintiff's purported trade secrets are well known among those in the industry, including Epic. Finally, defendants argue that plaintiff has known that its trade secrets can be found on the Inter-

---

4. If the petitioning party's action fails this objective test courts are to examine next subjective intent. *PRE,* 508 U.S. at 60, 113 S.Ct. 1920. A petition that fails both the objective and subjective tests is a sham and is not immunized by *Noerr–Pennington.*

net. According to defendants, these facts, and more specifically plaintiff's knowledge of them, make it unreasonable for IDX to believe that it has any trade secrets to protect.[5] Second, defendants argue that plaintiff had no basis to believe that any misappropriation had occurred in the design meetings.

It is not unreasonable to attempt to protect computer software or its components as a trade secret. Software "includes source code, which is the developer's tool in creating software, object code, and other technical information, including program architecture, design definitions or specifications, flow diagrams and flow charts, data structures, data compilations, formulae and algorithms embodied and used in the software." *ECT,* 597 N.W.2d at 483 (*quoting* Robert C. Scheinfeld & Gary M. Butter, *Using Trade Secret Law to Protect Computer Software,* 17 Rutgers Computer and Tech. L.J., 381, 383 (1991) (footnotes omitted)). As a general proposition computer software can, and often does, qualify for trade secret protection. *E.g. MAI,* 991 F.2d at 522.

Defendants have cited no evidence which would dissuade a reasonable litigant from believing it had a realistic expectation of possessing trade secrets. While it is undisputed that plaintiff gives potential customers significant access to its product there is no evidence that plaintiff's tradeshow demonstrations, on-site visits and promotional literature revealed trade secrets.[6] Trade show disclosure would not ordinarily include the types of information plaintiff eventually pursued as trade secrets. Plaintiff pursued vague concepts, designs, methods and processes that provide or underly features or functionalities of its product. As a practical matter, demonstrations of plaintiff's product are marketing tools and highlight the system's functionalities and capabilities and not the technical concepts as to how those functionalities are provided. This is reiterated by plaintiff's expert, who provides uncontroverted evidence that the level of information provided at software trade shows generally is not of the type or "level" of information containing trade secrets. *See* Expert Report of Donald Michaels, June 29, 2001, at 2.

Similarly, the promotional materials cited by defendants are nothing more than marketing materials trumpeting the functionalities, features and capabilities of plaintiff's product and their utility to customers. Nowhere does it appear within them that technical information is divulged. Moreover, the record shows that it is an industry-wide practice to attend these trade shows and hold on-site demonstrations and that few, if any, information management software vendors require potential customers to sign non-disclosure agreements. Thus, a reasonable litigant could expect to prevail by showing that such activities are consistent with reasonable efforts to maintain secrecy. A reasonable litigant would not believe that it had surrendered its trade secrets by using demonstrations and promotional literature.

---

**5.** Defendants also rely on plaintiff's conduct during the course of the litigation. While plaintiff's and its counsel's conduct has been at times obstructionistic such argument is irrelevant to the existence of whether plaintiff had probable cause *to institute* these proceedings.

**6.** Given that defendants cannot identify the specific trades secrets at issue because of plaintiff's inadequate specification it remains to be seen how defendants can now contend that specific trade secrets were disclosed by plaintiff through its practices. Just as plaintiff does not specify any trade secrets it possesses defendants cannot specify any trade secret plaintiff failed to protect.

While it is undisputed that large number of customer employees and former IDX employees are familiar with IDX's trade secrets defendants fail to mention plaintiff IDX's consistent use of confidentiality agreements. Typically, IDX's employees sign confidentiality agreements and IDX's customers sign agreements stating that they will treat IDX's proprietary information confidentially as they would their own.[7] Implicit in this is the requirement that customers impose confidentiality on their employees. While defendants point to exceptions where confidentiality agreements were not signed there is no requirement that trade secrets be subject to absolute secrecy. Those seeking to protect trade secrets need only employ reasonable measures to protect their trade secrets. Wis. Stat. § 134.90(1)(c)(2). Plaintiff's expert again testifies that it is the practice of many of those in plaintiff's industry to employ confidentiality agreements in an attempt to preserve secrecy. *See* Expert Report of Donald Michaels, June 29, 2001, at 2. By consistently employing confidentiality agreements with employees and customers, a reasonable litigant could realistically expect to have preserved its trade secrets despite a high degree of access by third parties.

Defendants have offered no evidence that the tailoring done to the specific IDX product employed by UWMF has extinguished trade secrets. Defendants' position amounts to a blanket assertion that because some unspecified customization has occurred plaintiff has lost all its trade secrets and should have known as much. Given the vague nature of this customization, a reasonable litigant could expect the possibility that at least some of its trade secrets could be protected.

The evidence that other competitors offer products with functionalities similar to those in the IDX product is insufficient by itself to show that plaintiff could not reasonably expect to protect its trade secrets. Defendants' argument necessarily assumes that the functionalities themselves are the trade secrets plaintiff seeks to protect. However, as stated previously, plaintiff identified, albeit insufficiently, its trade secrets as the concepts, designs, methods, and processes *underlying or providing* the functionalities it shared in common with competitors. The complaint identifies areas of technology and not just features and functions of the product. Pl.'s Compl. ¶¶ 52, 54. The fact that plaintiff's product had features in common with those of plaintiff's competitors is not reason for it to lose any expectation that its trade secrets were preserved.

Defendants resurrect their partial summary judgment argument that plaintiff's trade secrets were accessible on the Internet. Defendants have produced no evidence as to the duration of any public accessibility of plaintiff's user manuals on its customers' websites. It is undisputed that plaintiff knew that its manuals were accessible on the Internet for a brief period on one customer's website during the fall of 1999 and were again found to be more broadly accessible on multiple sites in May 2001 during the pendency of this litigation. When IDX learned in 1999 that its manuals were inadvertently accessible to the public via the Internet it took immediate action and directed the customer, the University of Virginia, to remove the mate-

---

**7.** The fact that *atypical* circumstances may exist where an employee or consultant did not sign such an agreement would not require a reasonable litigant to abandon hope of preserving its trade secrets as defendants argue. Whether isolated cases of employees not signing such agreements is consistent with overall reasonable measures to maintain secrecy is an issue upon which a reasonable litigant could realistically hope to prevail in court.

rial or block public access. To its knowledge this was done. If instead there was continuous Internet access to its materials until May 2001 there is no evidence that plaintiff had knowledge of this. Nor is there evidence that plaintiff possessed knowledge prior to its commencement of litigation of the more widespread public access to its materials in 2001 on other customer websites. Although plaintiff became aware of facts during discovery that may have damaged the protectibility of its proprietary information a reasonable litigant, knowing what plaintiff knew when it filed suit, had no reason to believe that its trade secrets had been extinguished and were therefore unenforceable. Even knowing that its manuals were posted for a brief period in 1999 on a customer website, a reasonable litigant still could expect, given the infancy of the law regarding trade secrets and the Internet, that its trade secrets were still not generally known, not readily ascertainable or were subject to reasonable secrecy measures.

Finally, defendants maintain that even if plaintiff could reasonably have expected to have preserved its trade secrets it had no basis to believe that any trade secrets were misappropriated by defendants. Plaintiff IDX and defendant Epic were engaged in a long and competitive vendor selection process to win defendant UWMF as a customer. Plaintiff IDX was the tentative winner of this competition when the UWMF board voted to enter negotiations with IDX in March 2000. Defendant

UWMF then reversed course and awarded the contract to defendant Epic in October 2000. At that time IDX officials began receiving anonymous correspondence alleging UWMF's unfairness and unethical behavior during the vendor selection process. Prior to IDX's filing of its action, in November 2000 UWMF employee Cliff Pulver, no longer anonymous, told IDX President Bob Hueber that UWMF had disclosed to Epic detailed information about the IDX system in a long series of face-to-face meetings between defendants UWMF and Epic. Aff. of Bob Hueber, ¶ 8. Defendant UWMF had substantial access to any trade secrets in IDX's product, and was under contract not to disclose them. Pulver told Hueber that a UWMF programmer had "translated" the IDX system to Epic programmers and that all of this was done to aid Epic in the vendor selection process. Id.[8] Although in hindsight plaintiff may have no case for trade secret misappropriation, given its state of knowledge prior to commencing suit a reasonable litigant in IDX's position realistically could have believed that its secrets had been misappropriated or were in jeopardy.

The circumstances surrounding the vendor selection process and the correspondence from at least one source from within UWMF provided probable cause for plaintiff to commence this litigation. This case, therefore, cannot be considered sham litigation. Under the *Noerr–Pennington* doctrine defendants' tortious interference

---

**8.** Defendants cite numerous objections to Hueber's affidavit. *See* Def. UWMF's Resp. to Pl. IDX's PFF in Supp. of IDX's Mot. for Summ. J., ¶ 37. Although they contend that Hueber's affidavit is self-serving and inconsistent with Pulver's deposition testimony, they provide no evidence contradicting Hueber's account of what Pulver said *during the prefiling interviews,* despite having ample opportunity to do so. What Pulver told Hueber prior to IDX's commencement of litigation is

relevant. This, and not what Pulver said subsequently, is what factored into plaintiff's choice to file suit. Their objection that the affidavit contains hearsay is meritless, as Pulver's statements are being offered as a basis for plaintiff's probable cause to file suit, and not for the truth of the matter asserted that defendants *actually* engaged in misappropriation. Defendants' remaining objections are similarly without merit.

claims cannot be used to impose liability upon plaintiff based on its resort to the federal courts.

### B. Substantive Requirements for Tortious Interference

■ Had defendants shown plaintiff's action to constitute sham litigation their tortious interference with contract claim was fatally defective nonetheless. To prevail on a claim of tortious interference with contract, defendants must show, among other things, that plaintiff interfered with their contract. *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir. 1999). Defendants maintain that plaintiff's lawsuit has imposed legal costs on them and therefore has interfered with their contract by making their respective performances more difficult. However, where, as here, there has been no induced breach of the contract the contracting parties must show interference with a particular contractual right. *Sampson Investments v. Jondex Corp.*, 176 Wis.2d 55, 499 N.W.2d 177, 184 (1993). The failure to show interference with a specific contractual right is fatal to a tortious interference claim. *Id.* Legal expenses and wasted time generally imposed on the defendants' operation are insufficient for this purpose. *Sampson* requires more than a disrupted expectancy that a contractual relationship will be continued in a certain manner. *Shank*, 192 F.3d at 689. Here, defendants contend that they had an expectancy that they could complete their contract in the absence of legal difficulties. Defendants conception of Wisconsin law, that any burden imposed on contractual performance is actionable as tortious interference, was the position taken by the dissent and rejected by the majority in *Sampson. Sampson*, 499 N.W.2d at 185 (Abrahamson, J. dissenting). Defendants have no cause of action for tortious interference under this theory of interference.

### V. Defendant UWMF's Claim for Declaratory Judgment on the Validity of Plaintiff's Contract

Defendant UWMF seeks a declaration that the confidentiality provisions in 1986 and the 1989 contracts unreasonably restrain trade contrary to Wis. Stat. § 133.03 and thus are invalid and unenforceable. Said defendant also seeks to recover all monies paid under the contracts pursuant to Wis. Stat. § 133.14.

### A. Declaratory Judgment—Wis. Stat. § 133.03

For the reasons set forth in Part III herein defendant is entitled to a declaration that Paragraph 12(c) of the 1986 contract and Paragraph 13.2.2(ii) of the 1989 contract both violate Wis. Stat. § 133.03 in part and thus cannot be enforced to protect confidential information that does not rise to the level of a trade secret under Wis. Stat. § 134.90. However, the provisions are valid in part and may be enforced to protect any trade secrets plaintiff may have in its product.

### B. Contract Payment Recovery—Wis. Stat. § 133.14

■ Section 133.14 of the Wisconsin Statutes states that "[a]ll contracts or agreements made by any person while a member of any combination or conspiracy prohibited by § 133.03 shall be void ..." and that "[a]ny payment made upon, under or pursuant to such contract or agreement may be recovered ...." Defendant UWMF seeks to recover all payments made to plaintiff IDX under the 1986 and 1989 contracts. Plaintiff has contested defendant UWMF's reliance on § 133.14, arguing that the statute applies only to contracts or agreements that are the product of a combination or conspiracy. This

Court agreed with defendant's interpretation on plaintiff's motion to dismiss, and held that § 133.14 applies to all contracts in violation of § 133.03 regardless of whether they were made as part of a combination or conspiracy. *See* Memorandum and Order of April 11, 2001 at 7.

The Court is persuaded to reconsider its prior interpretation of Wis. Stat. § 133.14. A more natural reading of the statute is the one proffered by plaintiff—that § 133.14 applies only to contracts that are made as part of a conspiracy or combination. The language "[a]ll contracts or agreements" is inclusive and is meant to cover all forms of pacts whether formal or informal. It is not designed to distinguish between contracts and agreements for the purposes of the statute. Indeed, the statute provides no basis for such a distinction between contracts and agreements. Under defendant's reading payments may be recovered upon every contract in restraint of trade and upon every agreement made as part of a conspiracy or combination in restraint of trade, but not upon simple agreements in restraint of trade that are *not* made as part of a combination or conspiracy. The Court finds no support for this result in the language of the statute nor in any decision of a Wisconsin court.[9]

There is no allegation or evidence that the 1986 or 1989 contracts or any provisions thereof were the products of a combination or conspiracy. Accordingly, defendant is not entitled to recover any payments it made under the 1986 or 1989 contracts pursuant to Wis. Stat. § 133.14.

Furthermore, even had this Court re-affirmed defendant UWMF's interpretation of Wis. Stat. § 133.14 it could not recover its contract payments made under the contracts. The confidentiality provisions are clearly provisions ancillary to the primary purposes of the 1986 and 1989 contracts. Partially invalidating these provisions will not defeat the primary purposes of the bargains—which were for the licensing of IDX's Practice Management System. Both contracts contain a severability provision. Wisconsin law provides for the severing of an illegal or invalid provision where the primary purpose of the contract can be enforced. *See Simenstad v. Hagen,* 22 Wis.2d 653, 126 N.W.2d 529, 534 (1964). Section 133.14 does not foreclose this result. Because § 133.14 conditions recovery to where the "contract or agreement is founded upon, is the result of, grows out of or is connected with any violation of [§ 133.03]" it is entirely consistent with severing invalid provisions where such severance does not defeat the primary purpose of the bargain. Here, it cannot be said that the bargain for the licensing of IDX's product grows from the confidentiality provisions. Rather, it is the reverse. Defendant made no payments under either confidentiality provision and therefore it has no payments under those provisions to recover. To allow defendant to recover more than ten years of payments made for the legitimate goods and services provided because of the inclusion of one illegal ancillary clause would be an absurd result, and one not called for or contemplated by § 133.14. Defendant is not entitled to such a windfall.

9. Defendant UWMF cannot rely on *Open Pantry Food Marts of Southeastern Wisconsin, Inc. v. Falcone,* 92 Wis.2d 807, 286 N.W.2d 149 (App.1979). The Court of Appeals in *Open Pantry* examined § 133.14 in the context of a statute of limitations question in the pleadings stage of a contract litigation. While the court broadly characterized the statute as a remedial one it never made a substantive interpretation as to the statute's applicability. *Open Pantry,* 286 N.W.2d at 152.

*VI. Defendant Intervenor Westfield's Cross Claim for Declaratory Judgment on Its Insurance Contract with Defendants UWMF, Quade and Rosencrance.*

Defendant intervenor Westfield is an insurance company licensed to do business in the State of Wisconsin. It maintains corporate offices in Westfield Center, Ohio. Westfield issued to defendant UWMF policy No. CSP 3 760 125 which provides insurance coverage during the time periods from January 1, 1999 to January 1, 2002. Westfield intervened in this action to resolve the question of its duty to defend and indemnify defendants UWMF, Quade and Rosencrance from IDX's claims.

The policy provides both primary Commercial General Liability ("CGL") coverage as well as Umbrella liability coverage. Both the CGL and Umbrella coverages provide insurance for "advertising injury," "personal injury" and "property damage." The CGL policy defines advertising injury to include the "[m]isappropriation of advertising ideas and style of doing business." The Umbrella policy includes this language in its definition of personal injury. Personal injury is defined by both the CGL and Umbrella policies to include "wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises." Property damage in both coverages is defined to include "[l]oss of use of tangible property that is not physically injured." Such property damage must occur a the result of an "occurrence," defined as an accident. Under the policy, Westfield has a duty and a right to defend suits that seek damages for "advertising injury," "personal injury" and "property damage", but the policy disclaims any such duty and right where the insurance does not apply by its terms.

■ An insurer's duty to defend depends on the allegations of the complaint, and is unrelated to the merits of the claim. *Newhouse v. Citizens Sec. Mut. Ins. Co.,* 176 Wis.2d 824, 501 N.W.2d 1, 5 (1993). It is triggered by the allegations found within the four corners of the complaint. *Id.* The duty to defend is not limited by a plaintiff's choice of legal theories—rather, where the conduct attributed to the insured in the complaint is arguably within the categories of covered wrong-doing the duty to defend will apply. *Curtis–Universal, Inc. v. Sheboygan Emergency Medical Services, Inc.,* 43 F.3d 1119, 1122 (7th Cir.1994).

Plaintiff IDX's claims against UWMF, Quade and Rosencrance by all accounts relate solely to theft of confidential information and trade secrets. UWMF employees are alleged to have met with Epic personnel to disclose aspects of the IDX Practice Management System including the product's design, processes, systems and organization. Defendants' alleged theft is limited to technical aspects of IDX's product. These alleged actions form the basis for plaintiff's claims for trade secret misappropriation, conspiracy and breach of contract against defendants.

■ Defendants UWMF, Quade and Rosencrance maintain that plaintiff IDX's complaint alleges conduct that arguably falls within misappropriation of advertising ideas and style of business. Advertising injury clauses are given an "ordinary language" meaning. *Zurich Ins. Co. v. Amcor Sunclipse North America,* 241 F.3d 605, 607 (7th Cir.2001). The contractual phrase "misappropriation of advertising ideas or style of business" was interpreted by the Wisconsin Court of Appeals in *Atlantic Mutual Ins. Co. v. Badger Medical Supply Co.,* 191 Wis.2d 229, 528 N.W.2d 486 (App.1995). By its plain meaning, an advertising idea is "an idea for calling public attention to a product or business,

especially by proclaiming desirable qualities so as to increase sales or patronage." *Id.*, 528 N.W.2d at 490. Similarly, a style of doing business refers to "a company's comprehensive manner of operating its business." *Id.* (stating that trade dress and distinctive sales techniques could qualify as style of business).

There is no allegation in plaintiff's complaint that can be read to allege that defendants misappropriated IDX's advertising ideas or style of business. Rather, all allegations of misappropriation relate to technical aspects of IDX's product itself, and not to ideas which call attention to IDX's product in the market or as to the manner in which it operates its business. Plaintiff has not alleged that defendants misappropriated the image of its product or business, or any techniques by which it operates its business. A style of business cannot be said to not include technical aspects of a product that creates functionality. Only such technical aspects are alleged to have been misappropriated. Plaintiff's specific allegations of misappropriation do not obligate Westfield to defend UWMF, Quade and Rosencrance under this part of the insurance contract.

 Defendants argue that Westfield must defend plaintiff's action because it amounts to a claim that IDX has suffered property damage in the "loss of use of tangible property that is not physically injured." This argument fails for several reasons. First, under this contractual provision the property damage related to loss of use occurs when the property in question is rendered useless by the insured's actions. *Wisconsin Label Corp. v. Northbrook Property & Cas. Ins. Co.*, 233 Wis.2d 314, 607 N.W.2d 276, 288 (2000) (analyzing cases). There is no allegation, explicit or implicit, in plaintiff's complaint that it has lost the use of its product as the result of defendants' purported trade secret misap-

propriation. Nor does plaintiff allege that the value of its product was diminished. The Court finds no support for the proposition that theft of trade secrets results in such a loss of use. Second, intellectual property such as trade secrets and copyrights are intangible property, not tangible property as required by the provision for coverage. *See Rhein Bldg. Co. v. Gehrt,* 21 F.Supp.2d 896, 902 (E.D.Wis.1998). Third, and finally, the trade secret misappropriation as alleged in the complaint was not an accident as required by the policy, but rather the product of a conscious course of action by UWMF, Quade and Rosencrance. Accordingly, plaintiff's complaint raises no duty to defend under the property damage coverage clause.

 Defendants finally maintain that the wrongful eviction definition of personal injury provides coverage under plaintiff's complaint. They cite a district court case holding that unsolicited e-mails are actionable as trespasses or wrongful entries. *See America Online, Inc. v. LCGM, Inc.,* 46 F.Supp.2d 444 (E.D.Va.1998). They argue by analogy that their conduct, as alleged, has effectively barred IDX from the UWMF computer system and thus may be viewed as a wrongful eviction. While in some legal circles defendants' argument, had it been better developed, would be lauded as "novel," "creative" or "inventive" this Court identifies it more accurately as "ridiculous" or "frivolous." Plaintiff's allegations permit no inference that it had a right to occupancy in UWMF's premises or access to its computer systems. Moreover, any fantastically-conceived wrongful eviction from UWMF's premises came as a result of UWMF's decision to hire Epic, which is not plaintiff's proposed basis for defendants' liability. No wrongful eviction can be created as a result of the alleged misappropriation that forms the entire ba-

sis for plaintiff's claims against defendants UWMF, Quade and Rosencrance.

The Court finds no coverage, whether affirmatively argued by defendants or left buried in the expanse of the insurance contract, that when read in conjunction with the allegations of IDX's complaint obligates defendant intervenor Westfield to defend UWMF, Quade and Rosencrance. Accordingly, Westfield is entitled to a declaration that it has no such duty to defend or to indemnify said defendants under the contract of insurance.

## VII. Scheduling of Contempt Hearing

Having resolved the substantive merits of the parties claims the Court schedules a contempt hearing for Attorney David Sellinger. *See* Memorandum and Order of July 11, 2001. Said hearing is scheduled in Court at 9:00 A.M. on August 15, 2001. Attorney Sellinger may show good cause at that time why he should not be found in contempt of court and fined for his actions detailed in the July 11 Memorandum.

Accordingly,

## ORDER

IT IS ORDERED that defendant UWMF's motion for summary judgment, in which defendants Epic, Rosencrance and Quade join in part, is GRANTED dismissing with prejudice plaintiff's claims for trade secret misappropriation, tortious interference with contract and breach of contract;

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment on defendant UWMF and defendant Epic's counterclaims for tortious interference with contract is GRANTED dismissing those counterclaims with prejudice;

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment on defendant UWMF's counterclaim for declaratory judgment is DENIED, that summary judgment is GRANTED in favor of defendant UWMF and that judgment is ordered in its favor declaring that Paragraph 12(c) of the 1986 contract and Paragraph 13.2.2(ii) of the 1989 contract are invalid in part and unenforceable to protect confidential information not rising to the level of trade secret under Wisconsin law;

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment on defendant UWMF's counterclaim for contract payment recovery under Wis. Stat. § 133.14 is GRANTED dismissing this counterclaim with prejudice;

IT IS FURTHER ORDERED that defendant intervenor Westfield's motion for summary judgment is GRANTED, and judgment is entered in its favor declaring that Westfield has no obligation under policy number CSP 3 750 125 to defend or indemnify defendants UWMF, Quade and Rosencrance from the claims of IDX in this action;

IT IS FURTHER ORDERED that a contempt hearing is scheduled in Court at 9:00 A.M. on August 15, 2001 whereby plaintiff's counsel Attorney David Sellinger may show good cause as to why he should not be found in contempt of court and fined;

IT IS FURTHER ORDERED that judgment be entered in favor of defendants dismissing plaintiff's complaint and all claims contained therein with prejudice and costs.

IT IS FURTHER ORDERED that judgment be entered in favor of plaintiff dismissing the counterclaims of defendants UMF and Epic with prejudice and claims except for that declaratory judgment which is entered in favor of defendant UMF declaring that Paragraph 12(c) of the 1986 contract and Paragraph 13.2.2(ii) of the 1989 contract are invalid in part and

unenforceable to protect confidential information not rising to the level of trade secret under Wisconsin law.