# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-3077

BONDPRO CORPORATION,

*Plaintiff-Appellant*,

*v.*

SIEMENS POWER GENERATION, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04 C 0026 C—**Barbara B. Crabb**, *Chief Judge*.

ARGUED MAY 11, 2006—DECIDED SEPTEMBER 12, 2006

Before POSNER, EASTERBROOK, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff in this diversity suit for theft of a trade secret won a verdict on liability from the jury; but before the jury proceeded to the second stage of a bifurcated trial—that of determining what damages, if any, the plaintiff had suffered—the district judge granted judgment for the defendant as a matter of law. Wisconsin law—but as adopted in Wisconsin, the Uniform Trade Secrets Act is to "be applied and construed to make uniform the law relating to misappropriation of trade secrets among states enacting substantially identical laws."

Wis. Stat. § 134.90(7). And so "decisions by other jurisdictions [than Wisconsin] on questions involving the UTSA are to be given careful consideration." *Minuteman, Inc. v. Alexander*, 434 N.W.2d 773, 779-80 (Wis. 1989).

We begin with some jurisdictional issues. Our Circuit Rule 28(a)(1) requires that the jurisdictional statement in a diversity suit name the states of which the parties are citizens. In violation of this rule, the jurisdictional statement in the plaintiff's brief fails to indicate the citizenship of the parties (both of which are corporations); it says only that they are "citizens of different states." The defendant's brief, compounding the violation, states that the plaintiff's jurisdictional statement is complete and correct. So we ordered the parties to supplement their jurisdictional statements, and the responses indicate that the parties are indeed citizens of different states and thus that the district court had diversity jurisdiction, for the case was removed to the district court by the out-of-state party and the amount-in-controversy requirement is satisfied. But the defendant's response added: "it appears that BondPro is not a corporation in 'good standing' with the State of Wisconsin, as its status of April 1, 2004, is listed as delinquent." Inquiry of the plaintiff's counsel at oral argument revealed that he didn't know his client's current status under Wisconsin law or whether that law authorizes a delinquent Wisconsin corporation to bring a suit in a Wisconsin state court. Apparently it does. The only consequence of delinquency is that the Wisconsin Department of Financial Institutions can bring an administrative proceeding to dissolve the corporation, Wis. Stat. § 180.1420, and this was not done. And shortly after the oral argument BondPro was restored to good standing.

Anyway, until a corporation's charter is revoked, it remains a corporate citizen of the state of incorporation, and

no more is necessary to allow it to maintain a suit in a federal court, *Smith v. Arundel Cooperative, Inc.*, 660 F. Supp. 912, 913 (D.D.C. 1987); 15 *Moore's Federal Practice* § 102.56[9], p. 102-132.5 (3d ed. 2005)—at least as a matter of federal jurisdiction; for it is always open to a defendant to show that the plaintiff in a diversity suit lacks capacity, under the law of the plaintiff's state, to bring a suit. Fed. R. Civ. P. 9(a). Any such defense was waived here, however, because while noting BondPro's delinquency the defendant makes no argument for dismissal based on it. Since a corporation's authority to sue in its state courts is not a jurisdictional prerequisite to removal on grounds of diversity, *Maryland People's Counsel v. FERC*, 760 F.2d 318, 319 (D.C. Cir. 1985) *Summers v. Interstate Tractor & Equipment Co.*, 466 F.2d 42, 49-50 (9th Cir. 1972) *Zelinger v. Uvalde Rock Asphalt Co.*, 316 F.2d 47, 53 (10th Cir. 1963); see also Fed. R. Civ. P. 9(a); *Wagner Furniture Interiors, Inc. v. Kemner's Georgetown Manner, Inc.*, 929 F.2d 343, 345-46 (7th Cir. 1991); *MTO Maritime Transport Over-Seas, Inc. v. McLendon Forwarding Co.*, 837 F.2d 215, 218 (5th Cir. 1988), the waiver eliminates the issue from our consideration.

We add that even if the plaintiff had dissolved since the removal of the case to the district court, this would not affect jurisdiction, *United States Liability Ins. Co. v. Fassbinder United Builders, Inc.*, No. 99 C 50330, 2003 U.S. Dist. LEXIS 1991, at *2 (N.D. Ill. Feb. 12, 2003); see *Wild v. Subscription Plus, Inc.*, 292 F.3d 526, 528 (7th Cir. 2002), unless its dissolution signified that there was no longer an adversary proceeding. But there might be; the dissolved corporation might have a successor that could be substituted for it and the suit continue. With immaterial exceptions, jurisdiction depends on the facts that exist when the suit is filed, e.g., *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570 (2004)—which means, by the way, that if BondPro had been

dissolved before suing and the dissolution had eliminated any interest it had in the suit, resurrection of the corporation after the suit was filed would not have conferred jurisdiction. *Wild v. Subscription Plus, Inc.*, *supra*, 292 F.3d at 528.

A further sign of the lawyers' carelessness is that their briefs are miscaptioned. The name of the defendant is given as "Siemens Westinghouse Power Corporation," which was changed before the appeal was filed. One might have expected the defendant's lawyer, at least, to know the name of his client. The lawyers' insouciance about jurisdiction, however, goes beyond carelessness, and we hereby direct counsel for both parties to show cause within ten days from the date of this decision why they should not be sanctioned for violating our circuit rule.

There is still another jurisdictional issue. It is whether BondPro has anything tangible to gain from reinstating the jury's verdict, for if not there is no case or controversy within the meaning of Article III of the Constitution. But to explain the issue will require a summary of the facts.

BondPro is a small company that manufactures products (it is still in business despite its scrape with the Wisconsin corporate authorities) that require the bonding of dissimilar materials. Siemens (a subsidiary of the German conglomerate), the defendant, makes electrical generators. The generators produce electrical power by spinning rotors over magnets. The rotors have slots into which copper coils are wedged. The outer layer of each coil consists of insulation material in the form of a U-shaped "slot cell." Siemens manufactures slot cells by first placing the insulation material in a U-shaped ("female") container and then pressing a "male" mold on top and applying heat. This process compresses the insulation into a rigid U-shaped material that can slide into the slots. The process resembles

putting material into a bowl and pressing another, slightly smaller bowl into the first bowl to compress and harden the material inside that bowl.

The disadvantage of the process is that the slot cell may emerge with wrinkles in the insulation material that are difficult to smooth out. BondPro developed (though it has never marketed) a process that dispenses with the female mold. Instead the insulating material is placed on the outside of the male mold and pressed against it by placing the mold and the insulation material in a vacuum bag so that air pressure compresses the material against the mold. Any remaining wrinkles are smoothed by hand. The ensemble consisting of the mold and the insulation material pressed against it is then placed in an autoclave, a container in which high levels of heat and air pressure are applied to the contents. The heat and pressure compress the insulation coating the mold into the desired rigid shape and it is then removed from the male mold and slid into a rotor's slot.

In 2001, Scott Wang, BondPro's principal, explained and later demonstrated the process to Mark Miller, a materials engineer employed by Siemens. Though there were some negotiations, they resulted only in agreement (as we shall see) on confidentiality; Siemens didn't seek a license from BondPro to use the process, even though BondPro had made clear in the course of the negotiations that it believed it had proprietary rights to it. Instead Miller filed a patent application on behalf of Siemens for a process similar to BondPro's (more precisely, similar to the description of BondPro's process in its appeal briefs) although among other differences it does not specify the use of an autoclave for the final step of hardening the insulation materials coating the male mold. There are other ways of applying heat and pressure; no particular way is specified in the patent application.

The Patent Office rejected Siemens' application and Siemens has never used the process. Nor for that matter has BondPro, except to make some prototypes to show Siemens. There may have been some use of BondPro's process by other companies, but if so there is no evidence of the value of such use.

Anybody other than Siemens can use the BondPro process without liability because, as BondPro acknowledges and indeed asserts, the process was disclosed to the world in Siemens's patent application. A trade secret that becomes public knowledge is no longer a trade secret. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984); *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 850 (1st Cir. 1985); see *ECT Int'l, Inc. v. Zwerlein*, 597 N.W.2d 479, 482 (Wis. App. 1999). The mere fact of mention in a public document is not controlling; no one may have noticed the document. See *Hoechst Diafoil Co. v. Nan Ya Plastic Co.*, 174 F.3d 411, 418 (4th Cir. 1999); *Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823, 849 (10th Cir. 1993). Publication in a patent destroys the trade secret, *On-Line Technologies, Inc. v. Bodenseewerk Perkin-Elmer GMBH*, 386 F.3d 1133, 1141 (Fed. Cir. 2004); *Scharmer v. Carrollton Mfg. Co.*, 525 F.2d 95, 99 (6th Cir. 1975), because patents are intended to be widely disclosed—that is the quid for the quo of the patentee's exclusive right to make and sell the patented device. But patent applications are not patents, and they used to be secret. However, now they have to be published after 18 months, 35 U.S.C. § 122(b)(i); 1-1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.06 n. 22 (2006), the aim of this rule being to disseminate the knowledge revealed in the application to the inventor community so that other inventors can build upon it. Published patent applications are in fact studied by inventors in the relevant field, and so a secret disclosed in them will ordinarily (we need not decide whether invari-

ably) lose its status as a trade secret. *Vital State Canada, Ltd. v. Dreampak, LLC*, 303 F. Supp. 2d 516, 525 (D.N.J. 2003). Of course a patent application that is rejected, as Siemens' was, is less likely to contain information that other inventors would want to use, but it might, since patent examiners are not infallible and a patent application might disclose some novel features or bring to light some forgotten prior art.

But had it not been for the alleged theft of BondPro's secret by Siemens, there would have been no patent application. So while someone who learned about BondPro's process from the application or some other source traceable to Siemens would have no liability for using the process without BondPro's consent, *Underwater Storage, Inc. v. United States Rubber Co.*, 371 F.2d 950, 955 (D.C. Cir. 1966); *DVD Copy Control Ass'n, Inc. v Bunner*, 75 P.3d 1, 27-28 (Cal. 2003) (concurring opinion), Siemens would be liable to BondPro for the consequences of enabling the innocent copying by revealing BondPro's trade secret to the world. *Syntex Opthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 683 (7th Cir. 1983); *Shellmar Products Co. v. Allen-Qualley Co.*, 87 F.2d 104, 109-10 (7th Cir. 1936); *Underwater Storage, Inc. v. United States Rubber Co., supra*, 371 F.2d at 955; *DVD Copy Control Ass'n, Inc. v Bunner, supra*, 75 P.3d at 27-28 (concurring opinion); Daniel W. Park, "Trade Secrets, the First Amendment, and Patent Law: A Collision on the Information Superhighway, 10 *Stan. J.L. Bus. & Fin.* 46, 56-57 (2004). To disclose a trade secret without authorization is unlawful, Wis. Stat. § 134.90(2)(b); *Hicklin Engineering, L.C. v. Bartell*, 439 F.3d 346, 349 (7th Cir. 2006); *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 726 (7th Cir. 2003), and the wrongdoer is liable for the consequences.

But there is no evidence of the value of any use that others may have made of BondPro's process who may have

learned of it directly or indirectly from Siemens. When to this absence of evidence is added the fact that neither BondPro nor Siemens has used the process commercially despite the investment that both companies made in its development (such as BondPro's construction of prototype slot cells for Siemens and Siemens' filing of a patent application), that Siemens apparently did not use the process because it decided it cost more than the conventional process that it was using to manufacture slot cells, and that the patent application describing a similar process was rejected, the inference is compelling that the process neither had when disclosed to the public, nor has, measurable commercial value.

Even a trade secret that had never been used at all could have a market value, enabling damages from the destruction of the secret to be estimated. *DSC Communications Corp. v. Next Level Communications*, 107 F.3d 322, 329-30 (5th Cir. 1997); *Metallurgical Industries, Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1208 (5th Cir. 1986); *Precision Plating & Metal Finishing, Inc. v. Martin-Marietta Corp.*, 435 F.2d 1262, 1263-64 (5th Cir. 1970). Otherwise trade secrets could not be licensed before they were used. But apart from a palpably inadequate expert's report rightly rejected by the district judge, BondPro presented no evidence that would have enabled the market value of its process to be estimated on any basis other than wild conjecture. See *Pioneer Hi-Bred Int'l v. Holden Foundation Seeds, Inc.*, 35 F.3d 1226, 1245 (8th Cir. 1994); *Metallurgical Industries, Inc. v. Fourtek, Inc., supra*, 790 F.2d at 1208; *Jillian's Billiard Club v. Belloff Billiards, Inc.*, 619 N.E.2d 635, 638 (Mass. App. 1993).

Although a damages remedy is thus out of the question, we do not think the case is (quite) moot. BondPro is seeking injunctive relief as well as damages, and it would presum-

ably be entitled to an injunction against Siemens' using the process itself, since, if BondPro is right, Siemens learned of the process only by stealing BondPro's trade secret, and it should not be allowed to profit from its wrongful act. *Syntex Opthalmics, Inc. v. Tsuetaki*, *supra*, 701 F.2d at 683; *Shellmar Products Co. v. Allen-Qualley Co.*, *supra* 87 F.2d at 109-10. Siemens says it has no plans to use the process, but conceivably it might change its mind if its legal jeopardy were removed.

How long such an injunction should last is a separate question, though not one we need resolve. *Minuteman, Inc. v. Alexander*, *supra*, 434 N.W.2d at 779, holds that the injunction "should terminate when a former trade secret becomes either generally known to good faith competitors or generally knowable to them because of the lawful availability of products that can be reverse engineered to reveal a trade secret," unless the infringer has benefited from having used it first; in that event the injunction should continue until the advantage over competitors conferred by this wrongfully acquired lead time has dissipated.

Coming at last to the merits, we consider first whether BondPro's process was ever a trade secret, and second whether if so it was improperly disclosed to the world by Siemens. It was not a secret from Siemens. BondPro disclosed it to Siemens in the hope of licensing it. Although it is awkward to license a trade secret because the negotiation necessarily reveals the secret to the prospective licensee, that revelation, as well as the revelation to suppliers and licensees, is obviously not the kind of disclosure that forfeits the protection of trade-secret law, *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.*, 925 F.2d 174, 179 (7th Cir. 1991); *Clark v. Bunker*, 453 F.2d 1006, 1010 (9th Cir. 1972), as otherwise trade secrets could not be licensed.

What does forfeit protection is a failure to take reasonable steps to prevent gratuitous disclosure. Wis. Stat. § 134.90(1)(c)(2); *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581, 583 (7th Cir 2002); see also *ECT Int'l, Inc. v. Zwerlein*, *supra*, 597 N.W.2d at 482. Failure to take such steps is persuasive evidence that the secret has no real value. Courts are entitled, moreover, to economize on their scarce resources of time and effort by refusing to help a secret holder who failed to take minimum steps to protect his secret before running to court. *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.*, *supra*, 925 F.2d at 179. Failure to take protective steps also sets a trap, since a company that ferrets out information that the originator does not think special enough to be worth incurring any costs to conceal will have no reason to believe that it *is* a trade secret. *Id*.

But BondPro did take measures to conceal its process that a reasonable jury could find sufficient. They included negotiating confidentiality agreements with employees, customers, and suppliers (including Siemens, with which it had two such agreements) and assuring that the process itself and documents describing it were kept under lock and key. *Id*. at 177, 180; *Hicklin Engineering, L.C. v. Bartell*, *supra*, 439 F.3d at 350; *Valco Cincinnati, Inc. v. N & D Machining Service, Inc.*, 492 N.E.2d 814, 819 (Ohio 1986). But because a trade secret is not a property right in anything like the sense in which copyright law and patent law create property rights, a would-be "thief" may be able to "steal" your secret without liability, for example if he copies it by reverse engineering or stumbles on it innocently (maybe you mislaid the document that describes it). *ConFold Pacific, Inc. v. Polaris Industries, Inc.*, 433 F.3d 952, 958-59 (7th Cir. 2006). In general, it is only when the theft is accomplished by a tort or a breach of contract that there is liability. So it is critical to consider whether Siemens violated its contractual

undertaking not to use or disclose information that BondPro conveyed to it as part of a negotiation for a possible sale or license of BondPro's process.

In the course of a negotiation the parties are sure to convey all sorts of information to each other that either has no commercial value or is already known to the receiving party from some other source. To use or disclose such information without the permission of the informing party is not a breach of a confidentiality agreement. Cf. *IDX Systems Corp. v. Epic Systems Corp.*, *supra*, 285 F.3d at 586. Anyway the agreements in this case expressly exclude information that is generally known, or known to Siemens before the disclosure to it by BondPro, or was developed by Siemens independently of the disclosure. BondPro's Wang described and demonstrated to Siemens' Miller the process and in so doing conveyed information. But how much of it was information at once previously unknown to Miller, unlikely to be discovered by him shortly, and commercially valuable? These questions are intertwined because a conveyance of information that is already common knowledge has no commercial value. That is why a suit for the appropriation of a trade secret requires proof that the information constituting the secret "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Wis. Stat. § 134.90(1)(c)(1); *ECT Int'l Inc. v. Zwerlein*, *supra*, 597 N.W.2d at 482; *Hogan Systems, Inc. v. Cybersource Int'l, Inc.*, 158 F.3d 319, 325 (5th Cir. 1998).("If the plaintiff has allowed his trade secret to fall into the public domain, he would enjoy a windfall if permitted to recover damages merely because the defendant took the secret from him, rather than from the public domain as it could have done with impunity." *Rockwell*

*Graphic Systems, Inc. v. DEV Industries, Inc., supra*, 925 F.2d at 179. The confidentiality agreements essentially just restated the statutory criteria of a trade secret.

The answers to the questions posed in the preceding paragraph depend on just what BondPro's claimed trade secret is. Is it merely the manufacture of rotor-coil insulation by applying heat and air pressure to insulation materials draped as it were around the fittingly named "male mold," as BondPro sometimes suggests? This was something Miller and others in the trade knew already because a company named Torr Technologies had described this method in advertising materials that Miller, doubtless along with others, had been given at a trade convention that he had attended in 2000. BondPro argues that Siemens should be estopped to make such an argument because the first claim in its patent application describes just such a barebones process, and if it was anticipated by Torr ("prior art") Siemens was lying to the Patent Office when it claimed that the process was novel (a requirement for the grant of a patent). But if Siemens played fast and loose with the Patent Office—even if it committed a fraud on the Patent Office—this was not a violation of BondPro's rights if, by virtue of Torr's anticipation, the process that BondPro now claims as a trade secret was known to the trade.

So if BondPro really had an invention that was concealed from Siemens, there would have to be more detail to it than we have thus far indicated; but we cannot find the detail. In places BondPro hints that the trade secret includes not just the heat and the air pressure but that these forces are exerted in an autoclave. Yet in its brief, in listing nine components that constitute the trade secret (some of them almost risible, such as "Stacking of Materials on Mold"), there is no mention of an autoclave, just of "Application of

Simultaneous Heat and Pressure," which could be done by other means, as by combining a convection oven to provide heat with a shrink-tape process ("shrink tape," as the term implies, is a wrapping that squeezes by shrinking) to provide pressure.

One expects a trade secret to be rich in detail, because a process described in general terms (squeeze insulation materials draped on the male mold with heat and air pressure rather than pressing the male mold into a female mold containing the materials) will usually be widely known and thus not worth incurring costs to try to conceal and so not a trade secret. See *IDX Systems Corp. v. Epic Systems Corp.*, *supra*, 285 F.3d at 583-84; *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (per curiam); *ECT Int'l, Inc. v. Zwerlein*, *supra*, 597 N.W.2d at 482-83; cf. *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 661-62 (4th Cir. 1993). In its reply brief BondPro acknowledges that "many of the elements of the BondPro slot cell manufacturing process were in the public domain" but states that "the precise execution of each element, in conjunction with the precise execution of each additional element, renders BondPro's process a secret." But BondPro has not told us what those details of execution or implementation are. For example, in the list of nine components the temperature and the duration of the application of heat are stated as a broad range rather than as specific numbers—and anyway Wang obtained the range from Siemens! And a broad range was all that Siemens's patent application disclosed—so if BondPro's trade secret resides in specifics that have not been disclosed to us, Siemens is not responsible for their disclosure.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*